COPY

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIGIO CEDEÑO )
)
and )
)
CEDEL INTERNATIONAL )
INVESTMENT LTD, )
)
Plaintiffs, )
)
v. )
)
INTECH GROUP, INC. )
DOMINGO R. MARTINEZ, )
PEDRO CARREÑO, )
JOSE JESUS ZAMBRANO LUCERO, )
JUAN FELIPE LARA FERNANDEZ, )
WERNER BRASCHI, )
GONZALO E. VAZQUEZ PEREZ, )
RUBEN ROGELIO IDLER OSUNA, )
RICARDO FERNANDEZ BARRUECO, )
ALHAMBRA INVESTMENTS LLC, )
JULIAN ISAIAS RODRIGUEZ DIAZ, )
EDGAR HERNANDEZ BEHRENS, )
ADINA MERCEDES BASTIDAS )
CASTILLO, )
MARIA ESPINOZA DE ROBLES, )
ALFREDO PARDO ACOSTA, )
MAIGUALIDA ANGULO, )
INDIVIDUAL JOHN DOE )
DEFENDANTS 1-30, and )
CORPORATE JOHN DOE )
DEFENDANTS 1-10 )
)
Defendants )

CIVIL ACTION NO. 09-cv-9716

(Redacted)

COMPLAINT FOR DAMAGES
AND EQUITABLE RELIEF

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiffs, by their counsel, bring this action for damages arising out of a wide-ranging money laundering scheme that utilizes New York-based U.S. banks to hold, move and conceal the fruits of fraud, extortion, and private abuse of public authority by individuals some of whom are officials of the government of Venezuela and some of whom are the allies of such officials. Specifically, Defendants use New York-based accounts that they control to

- enrich themselves, their family members and their political allies;
- punish people, such as plaintiff, whom they perceive to be their political adversaries, and frighten other such perceived adversaries into silence;
- extort political adversaries for the Defendants' own personal gain; and
- hold, conceal and move the fruits of this scheme – fruits that amount to many hundreds of millions of dollars.

The acts at issue in this case are the work of individual persons – the Defendants and those who are allied with them.  These people have created and operated a racketeering scheme that utilizes official machinery of the government of Venezuela to reap, and the banks of the United States to store, move and conceal, their gains.

Although they stem in significant part from the abuse of public power, however, the matters here at issue are ultimately a dispute between one wronged man, whose assets and freedom have been stolen from him using United States banks, and the people who have robbed him – first of his liberty and then of his wealth.

Defendants committed these acts in part simply because they could, and in part because they deemed Plaintiff Eligio Cedeño a threat to their hold on the money laundering machine by which, so long as they continue to operate it, they can continue to enrich themselves and their allies.

2

### THE PLAINTIFFS

1.      Plaintiff Eligio Cedeño, a citizen of Venezuela and formerly a resident of Caracas, is now incarcerated in the facilities of the Venezuela government intelligence police, at a location known as *El Helicoide*, where he has been held in "pretrial detention" since February 2007.

2.      Plaintiff Cedel Internation Investment Ltd. (CII) is a corporation duly incorporated and existing under the laws of the British Virgin Islands.  It maintains at least one bank account in the United States at the Bank of America.

### THE DEFENDANTS

3.      Defendant Intech Group, Inc. ("Intech") is a for profit corporation incorporated under the laws of Florida, with its principal place of business located at 8347 NW 68th Street, Miami, Florida, and with its registered agent listed as Domingo R. Martinez, with a mailing address of 10773 NW 58th Street, # 46, Doral, Florida 33178.  Intech maintains bank account No. ███████2333 with Bank of America in Miami, Florida, which was utilized in connection with certain of the transactions at issue in this case.  Public documents show that the company reports itself to have between 1 and 5 employees, and annual sales of approximately $500,000.

4.      Defendant Domingo R. Martinez ("Martinez") is, on information and belief, a resident of Florida, with a residence located at 10773 NW 58th Street, # 46, Doral, Florida 33178.

5.      Defendant Pedro Carreño ("Carreño") is a natural person and a resident of Caracas, Venezuela. He was at all relevant times the Minister of Justice and Interior of the government of Venezuela, the third highest level officer of the government.  Carreño is sued in his personal

capacity, inasmuch as all of the actions taken by Carreño and at issue in this case were taken for personal gain.

6.      Defendant Jose Jesus Zambrano Lucero ("Zambrano") is a natural person and a resident of Caracas, Venezuela.      He was at all relevant times an agent of Defendant Carreño. On information and belief, Zambrano maintains bank accounts in the United States.

7.      Defendant Juan Felipe Lara Fernandez ("Lara") is a natural person and a resident of Caracas, Venezuela.  He is an attorney.  Lara maintains bank accounts in the United States, including The Northern Trust International Banking Corporation in Jersey City, New Jersey, ABA Code ████1122, FC Merrill Lynch Account No. ██████0010, FFC Skow and Hegan Advisors, Inc. Account No. █████7200  and FFC Talbort A.V.V., Account No. ████7329, in which he has deposited, and on information and belief maintains, certain of the proceeds of the illegal activity in which he has engaged and which is at issue in this Complaint.

8.      Defendant Werner Braschi ("Braschi") is a natural person and a resident of Caracas, Venezuela.  Braschi maintains and/or controls bank accounts in the United States, including Bank of New York Account No. ████2385.  Braschi also maintains a residence at 800 E. Cypress Lane, Unit 102, Pompano Beach, Florida, 33069.

9.      Defendant Gonzalo E. Vazquez Perez ("Vazquez") is a natural person and a resident of Caracas, Venezuela. Vazquez maintains bank accounts in the United States in the name of Vazquez & Co., including UBS A.G. ABA No. ████7993, Beneficiary UBSFS Retail Account No. ██████40-00,   FFC Vazquez & Co., Account No. ████0165, in which he has deposited, and on information and belief maintains, certain of the proceeds of the illegal activity in which he has engaged and which is at issue in this Complaint.

4

10.     Defendant Ruben Rogelio Idler Osuna ("Idler") is a natural person and a resident of Caracas, Venezuela.  Idler maintains and/or controls bank accounts in the United States, in which he has deposited, and on information and belief maintains, certain of the proceeds of the illegal activity in which he has engaged and which is at issue in this Complaint.

11.     Defendant Ricardo Fernandez Barrueco ("Fernandez") is a natural person and a resident of Caracas, Venezuela.  Although he is nominally a private citizen of Venezuela, he is a close friend and associate of the highest leaders of the Venezuelan goverment, including Venezuelan President Hugo Rafael Chávez Frías.  Fernandez's security guards are provided, and paid, by the government of Venezuela, and they provide protection while using official, government-issued vehicles (although while on this assignment they dress in plain clothes).   On information and belief, Fernandez maintains bank accounts in the United States, in which he has deposited, and on information and belief maintains, certain of the proceeds of the illegal activity in which he has engaged and which is at issue in this Complaint.

12.     Defendant Alhambra Investments LLC ("Alhambra") is a corporation, originally formed under the law of Delaware on September 10, 2004, but subsequently reincorporated under the law of Barbados.   Alhambra is, on information and belief, owned and/or controlled by Defendants Vazquez and Idler, who maintain bank accounts in the U.S. which were utilized in connection with certain of the transactions at issue in this case

13.     Defendant Julian Isaias Rodriguez Diaz ("Rodriguez") is a natural person and a resident of Caracas, Venezuela.   At all times relevant hereto Rodriguez was Attorney General of Venezuela.  Although the prosecutorial power in Venezuela is supposed to be apolitical and independent of the rest of the executive branch, in practice, Rodriguez did not carry out his

5

power independently.  Rather, Rodriguez was the immediate subordinate, and carried out the orders of Defendant Carreño. Rodriguez is sued in his personal capacity, inasmuch as all of the actions taken by him and at issue in this case were taken for personal gain.

14.     Defendant Edgar Hernandez Behrens ("Hernandez") is a natural person and a resident of Caracas, Venezuela.  At all times relevant hereto, this Defendant was the President and one of five members of the governing board of the Currency Administration Commission (*Comisión de Administración de Divisas*) (hereinafter "CADIVI").  CADIVI is the agency of the Venezuelan government which enforces that country's foreign exchange regime and regulations.   In particular, as detailed further below, the Commissioners of CADIVI have ultimate authority under Venezuelan law to authorize Venezuelan nationals to acquire U.S. currency at the official Venezuelan exchange rate.  Hernandez is sued in his personal capacity, inasmuch as all of the actions taken by him and at issue in this case were taken for personal gain.

15.     Defendant Adina Mercedes Bastidas Castillo ("Bastidas")  is a natural person and a resident of Caracas, Venezuela.  She is also the current director for the Bolivarian Republic of Venezuela at the Inter-American Development Bank in Washington, D.C.  At all times relevant hereto, this Defendant was one of the five members of the governing board of CADIVI.  Bastidas is sued in her personal capacity, inasmuch as all of the actions taken by this Defendant and at issue in this case were taken for personal gain.

16.     Defendant Maria Espinosa de Robles ("de Robles") is a natural person and a resident of Caracas, Venezuela.  Upon information and belief, at all times relevant hereto, this Defendant was one of the five members of the governing board of CADIVI.  De Robles is sued in her

personal capacity, inasmuch as all of the actions taken by this Defendant and at issue in this case were taken for personal gain.

17.     Defendant Pardo Acosta ("Acosta") is a natural person and a resident of Caracas, Venezuela.  Upon information and belief, at all times relevant hereto, this Defendant was one of the five members of the governing board of CADIVI.  Acosta is sued in his personal capacity, inasmuch as all of the actions taken by this Defendant and at issue in this case were taken for personal gain.

18.     Defendant Maigualida Angulo ("Angulo") is a natural person and a resident of Caracas, Venezuela.  Upon information and belief, at all times relevant hereto, this Defendant was one of the five members of the governing board of CADIVI.  Angulo is sued in her personal capacity, inasmuch as all of the actions taken by this Defendant and at issue in this case were taken for personal gain.

19.     Individual John Doe Defendant #1 is a natural person whose residence and citizenship is currently unknown.

20.     Individual John Doe Defendant #2 is a natural person whose residence and citizenship is currently unknown.

21.     Individual John Doe Defendant #3 is a natural person whose residence and citizenship is currently unknown.

22.     Individual John Doe Defendant #4 is a natural person whose residence and citizenship is currently unknown.

23.     Individual John Doe Defendant #5 is a natural person whose residence and citizenship is currently unknown.

24.     Individual John Doe Defendant #6 is a natural person whose residence and citizenship is currently unknown.

25.     Individual John Doe Defendant #7 is a natural person whose residence and citizenship is currently unknown.

26.     Individual John Doe Defendant #8 is a natural person whose residence and citizenship is currently unknown.

27.     Individual John Doe Defendant #9 is a natural person whose residence and citizenship is currently unknown.

28.     Individual John Doe Defendant #10 is a natural person whose residence and citizenship is currently unknown.

29.     Individual John Doe Defendant #11 is a natural person whose residence and citizenship is currently unknown.

30.     Individual John Doe Defendant #12 is a natural person whose residence and citizenship is currently unknown.

31.     Individual John Doe Defendant #13 is a natural person whose residence and citizenship is currently unknown.

32.     Individual John Doe Defendant #14 is a natural person whose residence and citizenship is currently unknown.

33.    Individual John Doe Defendant #15 is a natural person whose residence and citizenship is currently unknown.

34.    Individual John Doe Defendant #16 is a natural person whose residence and citizenship is currently unknown.

35.    Individual John Doe Defendant #17 is a natural person whose residence and citizenship is currently unknown.

36.    Individual John Doe Defendant 18 is a natural person whose residence and citizenship is currently unknown.

37.    Individual John Doe Defendant #19 is a natural person whose residence and citizenship is currently unknown.

38.    Individual John Doe Defendant #20 is a natural person whose residence and citizenship is currently unknown.

39.    Individual John Doe Defendant #21 is a natural person whose residence and citizenship is currently unknown.

40.    Individual John Doe Defendant #22 is a natural person whose residence and citizenship is currently unknown.

41.    Individual John Doe Defendant #23 is a natural person whose residence and citizenship is currently unknown.

42.    Individual John Doe Defendant #24 is a natural person whose residence and citizenship is currently unknown.

43.     Individual John Doe Defendant #25 is a natural person whose residence and citizenship is currently unknown.

44.     Individual John Doe Defendant #26 is a natural person whose residence and citizenship is currently unknown.

45.     Individual John Doe Defendant #27 is a natural person whose residence and citizenship is currently unknown.

46.     Individual John Doe Defendant #28 is a natural person whose residence and citizenship is currently unknown.

47.     Individual John Doe Defendant #29 is a natural person whose residence and citizenship is currently unknown.

48.     Individual John Doe Defendant #30 is a natural person whose residence and citizenship is currently unknown.

49.     Corporate John Doe Defendant #1 is a business entity whose place of incorporation and principle place of business is currently unknown.

50.     Corporate John Doe Defendant #2 is a business entity whose place of incorporation and principle place of business is currently unknown.

51.     Corporate John Doe Defendant #3 is a business entity whose place of incorporation and principle place of business is currently unknown.

52.     Corporate John Doe Defendant #4 is a business entity whose place of incorporation and principle place of business is currently unknown.

53.     Corporate John Doe Defendant #5 is a business entity whose place of incorporation and principle place of business is currently unknown.

54.     Corporate John Doe Defendant #6 is a business entity whose place of incorporation and principle place of business is currently unknown.

55.     Corporate John Doe Defendant #7 is a business entity whose place of incorporation and principle place of business is currently unknown.

56.     Corporate John Doe Defendant #8 is a business entity whose place of incorporation and principle place of business is currently unknown.

57.     Corporate John Doe Defendant #9 is a business entity whose place of incorporation and principle place of business is currently unknown.

58.     Corporate John Doe Defendant #10 is a business entity whose place of incorporation and principle place of business is currently unknown.

## JURISDICTION AND VENUE

59.     This Court has jurisdiction over the subject matter of this dispute by operation of 28 U.S.C. §1331 (federal question jurisdiction), and 28 U.S.C. §1350 (for the alleged violations of international human rights law).

60.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) inasmuch as a substantial part of the events giving rise to the claim occurred here, and inasmuch as a substantial part of the property that is the subject of the action is situated here.

## FACTS AT ISSUE

11

A.    Who is the Plaintiff, Eligio Cedeño?

61.    In 2003 Plaintiff Eligio Cedeño was Vice President of Finance for Banco Canarias,

("Canarias") a financial institution in Caracas, Venezuela engaged in normal banking activities.

In addition, like every other banking institution in Venezuela, Banco Canarias was required by

Venezuela Currency Exchange Decree No. 1, Article 28, to act as a foreign exchange agent for

entities seeking foreign currency.  He is a self-made man, having risen out of a poverty-stricken

neighborhood, in which he was raised with his brother, by his mother, a single parent, under

severe life conditions.  By the time of the facts at issue in this case, after roughly 20 years of hard

work, he was a successful man and an accomplished banker.

62.    He was also an important proponent of individual liberty and responsibility in Venezuela.

He has never been a candidate for public office, preferring to make his contribution to

Venezuelan society through a charitable foundation - *Fundación Cedel* ("the Foundation") --

which he established and funded to address poverty and other social issues in Venezuela.

63.    The Foundation combines financial assistance with human aid, to foster a sense of

enfranchisement among Venezuela's youth, emphasizing the value of hard work and personal

effort. *Fundación Cedel* has provided financial assistance to more than 27 schools, supplied

urgent medical care for more than 40 terminal disease patients, and established monthly

economic aid arrangements for over 1,000 families in some of the poorest neighborhoods in

Venezuela.  Over the years, it has contributed more than $6 million to *TeleCorazón*, Venezuela's

primary annual fundraising television event for the charity that supports the children abandoned

on the streets.

64.     Until his arrest, Cedeño was an active participant in the *Fundación Cedel* projects.  For example, during the Christmas holidays, he and his family personally distributed gifts in some of the poorest neighborhoods in Caracas.  In 2006, he arranged and helped design the lighting of the River Guaire promenade, which was enjoyed by the Caracas community for weeks during the holiday season.

65.     Although not involved directly in Venezuelan politics as a candidate for public office, Cedeño has supported several members of the opposition.  While Venezuela has become a highly polarized country of camps supporting or opposing the government, Cedeño has never been a vocal or public opponent of the Bolivarian Revolution, but the government perceives him as such.[1] This is partly based on his friendship with and support of Patricia Poleo, Carlos Ortega, and other leaders of the Venezuelan opposition, which President Chávez has taken as a personal affront.  As more fully detailed below, members of the Venezuelan regime and their acolytes have expressly told Cedeño and those acting for him that plaintiff was put in prison, and remains there, because he is an enemy of President Chávez and his political movement commonly referred to by its sympathizers as the "Bolivarian Revolution."

66.     Patricia Poleo is the editor of the periodical *El Nuevo País,* whose outspoken opposition to Chávez has been fierce and open.  Such was Chávez's rancor for Poleo that he had her charged in 2004 with complicity (*i.e.*, intellectual authorship) in the murder of an avowed Pro-Bolivarian Revolution prosecutor, Danilo Anderson, who had been responsible for the

---

[1] Cedeño was told by Diosdado Cabello, who at the time was Governor of Miranda and understood to be the #2 person in the Venezuelan regime, that the government was "convinced" that Cedeño helped Carlos Ortega to flee the country.

investigation into the events of April 11, 2002.[2]  Convicting Poleo for the Anderson murder seemed calculated to punish her for opposing the government of the Bolivarian Revolution, while linking her to the April 11 events in order to encourage public support for her prosecution. Although there was no evidence of wrongdoing by Poleo, she had ample reason for concern. Three police officers – two brothers and one cousin, all named Guevara – were convicted of carrying out Anderson's murder, solely on the basis of the testimony of a single witness, Geovanny Vásquez, who was later exposed as having been paid by the Attorney General's Office to testify falsely in the case.  Significantly, Vásquez's testimony also implicated Poleo, who concluded that she was the next political target.  Therefore, rather than present herself to the authorities to be subjected to a fraudulent prosecution, she left Venezuela in January 2006, and went to the U.S., where she has been granted political asylum. While Cedeño denies any involvement in Poleo's departure, some rumors have circulated that Cedeño helped her leave the country.

67.     Cedeño also had a close friendship with Carlos Ortega, the leader of the largest labor union in Venezuela, the Venezuelan Workers Union (*Confederación de Trabajadores de Venezuela* (CTV)).  In that role, Ortega led a national strike to protest the "increasingly dictatorial" policies of President Chávez, which culminated in the events of April 11, 2002. Ortega also rallied the management at Petroleos De Venezuela SA ("PDVSA"), the national oil company, behind a major labor strike designed to force Chávez's resignation.  President

---

[2] On April 11, 2002, a massive public demonstration was held in Caracas in protest against policies of the Chávez government.  In response to crowd movement, President Chávez ordered the implementation of so-called *Plan Ávila*, a security plan aimed at using the "National Guard" against Venezuelan citizens and civilians that had, in separate events in 1989, resulted in the deaths of hundreds of Venezuelan citizens.  On April 11, the joint chiefs of military staff and key military leaders ignored Chávez's order and refused to implement *Plan Ávila*.  The events of that day – the details of which are still hotly debated – resulted in Chávez's three-day absence from the Presidency and 19 deaths.  Chávez has described the incident as a *coup d'état*.  Others characterize it as a power vacuum or a coup against the civil protest movement.

Chávez's animosity toward Ortega cannot be overstated, and he reacted by firing all of PDVSA's upper management and roughly 18,000 PDVSA employees, while Ortega himself was arrested, tried and convicted for his labor activities as a "traitor" to Venezuela.   Ortega subsequently escaped captivity and fled Venezuela in August 2006.  Rumors that Cedeño helped Ortega exit the country likely stem from the fact that Cedeño has provided financial assistance to the Ortega family, including while he was incarcerated.  An investigation by military prosecutors into Cedeño's role, however, revealed no connection between the plaintiff and Ortega's escape from the country.

i.    The Venezuelan Bolivarian Revolution Money Laundering Scheme  That
Operated In This Case

68.    Through a combination of official government action, the threat of official action taken for private purposes and unofficial acts, by government officials and their friends, the Defendants and others operating with them conducted an extensive money laundering scheme by which they achieve at least the following important and mutually supportive goals:

a.  They enrich themselves;

b.  They menace, extort, imprison and/or destroy those whom they

perceive to be their enemies, including those who have sought to divest defendants and their allies of power – including the power to control and utilize the money laundering regime described herein; and

c.  They fund activities that the Bolivarian government wishes to support secretly, but that are not the subject of this complaint, including, but not limited to, drug

15

trafficking and support for terrorist groups, as more fully described in a recent speech to the Brookings Institute by Manhattan D.A. Robert A. Morgenthau. See http://www.gfip.org/index.php?option=com_content&task=view&id=257&It emid=74

## REGULATORY BACKGROUND

69.    The foundation stone of Venezuela's currency exchange racketeering operation is the pegged rate of the Bolivar, the Venezuelan currency, which coexists with a significantly higher parallel (free market) rate of the Bolivar.

70.    Until 2003, the Bolivar traded freely against other currencies in international exchange markets.  In that year, however, the price of oil fell dramatically and the financial health of Venezuela deteriorated as a result of a lengthy national strike.  As oil is an important commodity for the Venezuelan economy (over 80% of GDP), the result of this drop in petroleum prices was a plunge in the currency reserves supporting the value of the Bolivar.  The government of the Bolivarian Revolution, which was in power at that time, briefly suspended all international currency exchange, and when trading resumed, the exchange rate was fixed, or "pegged," at 1.60 Bolivars to the U.S. dollar, subsequently modified to 1.915 and later to 2.15 bolivars per dollar (current official rate).  This pegging was purportedly intended to be temporary, but it has been prolonged intentionally in order to further the racketeering scheme.

71.    Indeed, the official rate bears no resemblance to the market rate that would be in effect if the Bolivar were allowed to trade freely.  Rather, a separate market therefore came into

existence, wherein Bolivars were traded at levels much closer to those that would obtain in a genuine free market.

72.     In addition, the professional market (brokers dealers, brokerage houses, financial institutions among others) has created a mechanism by which legal exchange at the market rate can be effected.  This is done through the buying, selling and/or swapping of Bolivar denominated Venezuelan government bonds and/or US Treasury bills, and is commonly referred to as the "Parallel Exchange Market" or simply the "Parallel Market".

73.     The Venezuelan government also participates on the Parallel Market, directly (Republic of Venezuela) and indirectly (PDVSA), in an attempt to influence (lower) the Bolivar Parallel Exchange Rate.

74.     In fact, the Venezuelan government and PDVSA have been active issuers of Dollar Denominated Bonds (under US law) which have been sold locally in Bolivars.  Bonds are sold in the international market, mainly to the mainstream American Broker Dealers based in the US, in exchange for dollars therefore effectively converting Bolivars into dollars.  Additionally, the Government and PDVSA have sold structure notes and bonds in private assignments to friendly financial institutions and broker dealers.

75.     The government of Venezuela not only maintains this two level currency exchange system, and determines the exchange rate for both: it also effectively allows access to the lower, official exchange rate to be granted on the basis of political or personal connection to the officials who evaluate applications for exchange at the official rate.  The government thereby created an enormous source of profit (and of social, political and economic control) for all who participate in it, and particularly for those who govern the foreign exchange regime (and their

17

friends). Their political connections to the government of the Bolivarian Revolution, combined with the widespread (and widely documented) corruption of that regime, allow members of the regime and their supporters to trade in this market with impunity.

76.    Many of those able to participate in the market for dollars in Venezuela profit in two simple concurrent ways:

   a. through their control of CADIVI, kickbacks to CADIVI officials, or their relationship with those who control CADIVI, the favored few buy dollars for Bolivars at the pegged government imposed rate, which they then sell on the parallel market for their true, significantly higher, market value, pocketing the difference as profit; and

   b. through their control of the Ministry of Finance and/or PDVSA, kickbacks to both entities officials, or their relationship with those who control those entities, the favored few get assigned discretionary amounts of dollar denominated Bonds for Bolivars at an implicit exchange rate lower that parallel market rate. They then sell the bonds to broker-dealers abroad (mainly US based) obtaining dollars at a rate significantly lower than the prevailing (market value) parallel exchange, which as in (a), above, yields profit on the difference between the two rates.

77.    At the time of the filing of this complaint, the parallel market rate for bolivars is roughly three times higher than the official pegged rate – so that extraordinary fortunes can be made quickly by those – including the CADIVI commissioner defendants and their friends and political allies -- with access to dollars at the official exchange rate and/or to a lesser extent the preferential allotment of dollar denominated bonds that are paid in Bolivars.

18

78.    The key to being able to engage in the most lucrative part of this lucrative business is the ability to obtain dollars at the pegged rate -- something that the government of Venezuela strictly controls through its foreign exchange regulations and CADIVI's discretionary powers. Significantly, it is persons favored by the government of the Bolivarian Revolution – whether due to political loyalty, the payment of bribes to government officials, or for other reasons – who are able to do this.

79.    To obtain permission to make a purchase of dollars at the official rate, a company or individual must demonstrate a legitimate need for dollars. One such legitimate reason for buying dollars with Bolivars is the claim to be importing some (legal) import form outside of Venezuela, which must be paid in dollars (or other hard currency).

80.    Relatedly, one of the statutory structures under which Venezuela law permits an authorization of foreign currency to pay for imported goods requires the goods to be physically present in Venezuela before CADIVI will authorize the currency exchange. This is the structure used in the vast majority of import transactions in Venezuela. Due to the reluctance of foreign banks to issue letters of credit to Venezuelan buyers, these regulations in reality effectively require an importer to pay or to deposit a cash collateral to its seller in full (using the seller's foreign currency denomination) in order to obtain delivery of the goods in Venezuela before the importer is able to apply to CADIVI for a currency exchange. Thus, when an importer submits its currency exchange application to CADIVI, the importer is actually seeking to repay its own outlay of foreign currency.[3] Further, when the importer is awarded the requested foreign currency by CADIVI, the exchange agent (i.e., a Venezuelan commercial bank) is required to

---

[3] In order to maintain the fiction that foreign banks do not lack confidence in Venezuela, CADIVI denies any foreign currency exchange application in which the importer discloses the fact that the goods have been prepaid.

deliver the payment directly to the seller, which has already been paid once (or has given collateral) for the goods. Thus, the Venezuelan importer is forced to trust the seller to return the second payment to the importer.

81.     Currency exchange transactions for payment of imported goods are often financed by the importer through lenders who supply the Bolivars. Otherwise, the importer would need double the working capital to fund the two transactions. The transactions sometimes involve an escrow agent, who takes delivery of the funds as they returned by the seller (second payment) and distributes the proceeds, pursuant to an agreement, including repayment of the lenders.

82.     One claiming to need dollars for reason of importing goods must complete an extensive set of government documents identifying: (1) the product to be imported; (2) the lack of availability of such product domestically; (3) the fact that the product has arrived in Venezuela; (4) the person or entity supplying the product; and (5) the amount in dollars that the supplier must be paid, in the form an invoice.

83.     A person purporting to engage in such a transaction completes the requisite documents and submits them to a Venezuelan bank acting as exchange agent. The bank's function as exchange agent is mandatory and not discretionary, as a matter of Venezuelan law. The bank, acting through an authorized bank employee, reviews the documents to ensure that they are complete (though the bank employee has neither the duty, nor the tools, nor the liability under Venezuelan law to ensure that the claimed transaction is actually being engaged in, or that the documents being submitted are genuine and not fraudulent).

84.     If the application documents are complete, the Venezuelan bank, as currency exchange agent and acting through its authorized employees, provides the documents to CADIVI.

CADIVI reviews the application documents, and if it approves the currency exchange transaction, CADIVI supplies to the exchange agent a written authorization for the applicant to acquire foreign currency ("AAD"), and the exchange agent notifies the applicant and the Central Bank of Venezuela ("CBV"). After the transaction has been approved by CADIVI, the applicant – either directly or through a lender – arranges to tender to the exchange agent bank a sum of bolivars equivalent to the requested dollar amount at the official exchange rate. Once that tender is arranged, the exchange agent notifies the CBV, which provides to the exchange agent a written authorization to effect the transaction ("ALD"). The bank then transmits the bolivars to the CBV, which exchanges the bolivars into dollars at the pegged rate and transmits the dollars back to the exchange agent. The Venezuelan bank then wire transfers the dollars directly to the supplier of the imported goods, the vast majority of which are located in the U.S. and have bank accounts in the U.S.

85.    Defendants Hernandez, Bastidas, de Robles, Acosta and Angulo routinely made use of a New York bank account maintained by the Central Bank of Venezuela in order to release the dollars they had decided to grant to those applicants who paid sufficient bribes, or who had sufficient political influence, to obtain access to U.S. currency at the lower, pegged rate. During the period of the Transaction described more fully below, the New York bank utilized was Bank of America. Presently, CBV maintains an account at ███8667 at the New York branch of Deutsche Bank.

86.    By virtue of their positions within CADIVI, Defendants Hernandez, Bastidas, de Robles, Acosta and Angulo had effective control over the CBV account described above in ¶85 and could, and did, utilize that account to release dollars to those whom they favored, in exchange for bribes, kickbacks or for other personal reasons or benefits.

21

C.    The Defendants' Money Laundering Scheme, Operating Through A U.S.
Bank, Is Used to Entrap Plaintiff

87.    The multi-level foreign exchange system described above is prone to fraud and abuse.
One such method of fraud involves an applicant that requests dollars for payment of non-existent
imported goods.   Because foreign exchange transactions require extensive documentation, a
fraudulent foreign exchange transaction involves extensive documentary fraud.   Where, for
example, the exchange fraud involves fictional imported goods, falsified documents necessarily
include invoices, customs documents, import tax documents and shipping documents, among
others.    These conditions render the exchange agents particularly vulnerable to false
incrimination by the regulatory authorities, because all of the documents pass through the hands
of the exchange agents.[4]

88.    The plaintiff in this case was targeted by just such a fraudulent foreign exchange
transaction (the "Transaction," or the "Microstar Transaction"), which worked as follows:

89.    Microstar, a Venezuelan company involved in the retail distribution of computers and
related equipment, applied to CADIVI for U.S. dollars to pay for computer product ostensibly
supplied and delivered to Venezuela by Intech.    The applications were submitted through
Canarias.

90.    Canarias submitted applications to CADIVI, which – by action of Defendants Hernandez,
Bastidas, de Robles, Acosta and Angulo – approved the transactions presumably knowing that
they were fraudulent and that, as set forth in greater detail below, no computer products were

---

[4] These conditions also explain why the government signs an agreement with each bank in Venezuela, including
Canarias, the bank at which the plaintiff worked during the period at issue in this case, expressly exempting the bank
and its employees from liability for the authenticity and veracity of documents submitted by currency exchange
applicants.

actually being imported.  Each of these Defendants took this action for personal gain (through bribes and/or kickbacks), inasmuch as they personally benefited from the financial bonanza produced by the purchase of U.S. dollars for Bolivars at the official rate, the movement of those dollars into and out of a series of U.S. bank accounts in order to conceal their source and the nature of the activity that produced them, and the subsequent resale of such dollars for Bolivars at the market rate.

91.     Canarias notified Microstar that the applications had been approved.

92.     Microstar entered into loan agreements with seven separate funding companies (collectively the "Funding Companies").  As more fully detailed in ¶93, the two types of financial transactions used were (a) Sale and Repurchase Agreements of Bolivar denominated Venezuelan sovereign bonds (National Public Debt) ( "the DPN Transactions") and (b) repurchase agreements ("repos") based upon the transfer of dollar-denominated promissory notes issued by the Ministry of Finance of the Venezuelan government ("the Promissory Note Transactions").  The Funding Companies were Representaciones Rovalco, C.A.; Inversiones Fieva 124, C.A.; Inversiones Gioma 125, C.A.; Inversiones Inter 2998, C.A.; Inversiones Tadeo 123, C.A.; Inversiones Vanaresi 48, C.A.; and Representaciones Paulov, C.A.

93.     In particular, the details of these transactions are as follows:

| Lender | Date | BS | $ Equivalent | Vehicle |
|---|---|---|---|---|
| Inversiones Fieva 124, C.A. | Aug. 22, 2003 | BS 18,898,376.98 | $11,811,480.00 | DPN Transaction |
| Representaciones Rovalco, | Oct. 9, | BS  862,160.00 | $538,850.00 | DPN Transaction |

23

| | | | | |
|---|---|---|---|---|
| C.A. | 2003 | | | |
| Inversiones Inter 2998, C.A. | Sep. 29, 2003 | BS 8,301,760.00 | $5,188,600.00 | Promissory Note Transaction |
| Inversiones Tadeo 123, C.A. | Sep. 29, 2003 | BS 3,500,000.00 | $2,187,500.00 | Promissory Note Transaction |
| Inversiones Fieva 124 | Sep. 29, 2003 | BS 3,500,000.00 | $2,187,500.00 | Promissory Note Transaction |
| Inversiones Vanaresi 48, C.A. | Sep. 29, 2003 | BS 3,500,000.00 | $2,187,500.00 | Promissory Note Transaction |
| Representaciones Paulov, C.A. | Sep. 30, 2003 | BS 3,500,000.00 | $2,187,500.00 | Promissory Note Transaction |
| Inversiones Gioma 125, C.A. | Sep. 30, 2003 | BS 1,306,208.00 | $816,425.00 | Promissory Note Transaction |

94.     Pursuant to these funding transactions, the Funding Companies tendered a total of 43,368,504.98 Bolivars to Canarias – on behalf of Microstar – which transferred them to CBV.

95.     CBV then transferred an equivalent sum in dollars – a total of $27,105,310.00 – to Canarias' bank account number ███4200 at Citibank, N.A. in New York, New York.

96.     Canarias then transferred the same amount – a total of $27,105,310– to an account in the name of defendant Intech Group Inc., account No. ███████2333 at Bank of America in Weston, Florida.

24

97.    Because Defendant Intech's annual revenue is normally approximately $500,000, it is inconceivable that either Defendants Intech and/or Martinez could be unaware of the fact or nature of these deposits, which vastly exceeded any normal business transaction for the company.  It is also inconceivable that Defendants Intech and/or Martinez could be unaware that these funds were received by Defendant Intech in light of the fact that Defendant Intech had in fact not delivered any computers to Venezuela.

98.    It necessarily follows, therefore, that Defendants Intech and Martinez understood the fraudulent nature of each of the transactions here at issue and of the overall Transaction.

99.    Of the $27,105,310 it received, Defendant Intech transferred a total sum of $26,396,060 to CII.  In 2003, CII was the entity that performed the function of escrow agent for all international financial transactions involving Canarias that required an escrow agent.  CII was a shareholder of Canarias.  CII had a general escrow agreement with the Funding Companies relating to the financing vehicles described in ¶ 92-93, above.

100.    Rather than reporting each of the above transactions to some governmental authority (or to the source of the funds) or otherwise identifying these transactions as errors, Defendants Martinez and/or Intech profited from them by retaining approximately $709,250 for their own benefit, solely as compensation for laundering the remainder of the funds, which Intech did not keep. Defendants Martinez and Intech engaged in no legitimate activity to earn these funds.

101.    CII distributed a total of approximately$26,396,000 pursuant to instructions from Microstar, as it was authorized to do.   The funds were distributed approximately as follows:

| Date | Amount | Purpose |
|---|---|---|
| 8/27/03 | $400,000 | Transfer to Intech, Inc. pursuant to instructions from Gustavo Arraiz |
| 8/29/03 | $8,480,038.11 | Purchase of Venezuela government bond by Microstar – BS 18,698,368,000.00 |
| 8/29/03 | $2,011,087.39 | Transfer to Gustavo Arraiz – Wachovia Bank N.A. of Florida, Acct. ████0021 |
| 8/29/03 | $506,835.85 | Transfer pursuant to instructions from Gustavo Arraiz |
| 8/29/03 | $189,638.76 | Transfer pursuant to instructions from Gustavo Arraiz |
| 9/3/03 | $14,133.40 | Transfer pursuant to instructions from Gustavo Arraiz |
| 9/4/03 | $14,147.06 | Transfer pursuant to instructions from Gustavo Arraiz |
| 10/2/03 | $1,580,827.00 | Purchase of Venezuela government bond by Microstar – BS 3,513,125,000.14 |
| 10/2/03 | $589,234.14 | Purchase of Venezuela government bond by Microstar – BS 1,309,473,520.00 |
| 10/3/03 | $209,395.01 | Purchase of Venezuela government bond by Microstar – BS 467,500,000.00 |
| 10/3/03 | $1,580,826.78 | Purchase of Venezuela government bond by Microstar – BS 3,530,625,000.00 |
| 10/6/03 | $1,214,466.68 | Purchase of Venezuela government bond by Microstar – BS 2,711,437,500.00 |
| 10/7/03 | $156,962.71 | Purchase of Venezuela government bond by Microstar – BS 350,437,500.00 |
| 10/7/03 | $3,500,000.00 | Transfer to Gustavo Arraiz – Wachovia Bank N.A. of Florida, Acct. ████0021 |
| 10/7/03 | $1,580,826.94 | Purchase of Venezuela government bond by Microstar – BS 3,517,500,000.00 |
| 10/8/03 | $2,000,219.86 | Purchase of Venezuela government bond by Microstar – BS 4,445,154,800.00 |

| 10/9/03 | $969,672.85 | Purchase of Venezuela government bond by Microstar – BS 2,154,937,500.00 |
| 10/9/03 | $586,526.66 | Transfer pursuant to instructions from Gustavo Arraiz |
| 10/10/03 | $810,972.31 | Purchase of Venezuela government bond by Microstar – BS 1,802,250,000.00 |
| Total | $26,395,811.51 | |

102.    The full range of required documentation was provided to Canarias by Microstar's representatives.  These documents included official Venezuelan Customs  Office documents stating that the computers being purchased were in a Customs Office warehouse in Caracas. Also included were invoices, import tax documents and shipping documents, among others.

103.    Neither Canarias nor Plaintiff knew that these documents were fraudulent; Plaintiff had no duty to know they were fraudulent; and he had no way to determine whether they were fraudulent.  As Vice President of Finance for Canarias, Plaintiff did not personally handle the majority of the paperwork associated with the transaction, and he was required to view – and only saw – a small fraction of the documents submitted to CBV in connection with the transaction.  Further, as a matter of Venezuelan law, the sole responsibility of Canarias and its officers/employees was to determine whether the documentation for the transaction was complete; whether the requisite amount of bolivars was being tendered by the ostensible purchaser; to transmit the bolivars to CBV; and to pay over the dollars received in exchange to the seller of the imported items identified in the documents.  This responsibility was circumscribed both for Canarias and equally for its employees and officers according to law and a Master Exchange Operator Agreement between Canarias and CADIVI. Accordingly, Canarias,

27

Plaintiff and Plaintiff's staff all properly performed all of the duties imposed upon them by Venezuelan law in connection with the transaction.

104.    Conversely, as a matter of Venezuelan law, CADIVI is responsible for approving all currency exchange transactions and has the duty to look behind applications and supporting documents to verify that the factual representations contained therein are accurate. Further, all currency transactions in excess of $1,000,000 must be approved by the governing board of CADIVI itself.

105.    It necessarily follows, therefore, that Defendants Hernandez, Bastidas, De Robles, Acosta and Angulo knew, or were reckless in failing to know, that many of the documents associated with the Transaction were forgeries and that the factual statements made therein were false. Nevertheless, Defendants Hernandez, Bastidas, De Robles, Acosta and Angulo personally approved the Transaction.

106.    It was later determined that the documents submitted to Canarias and Plaintiff to induce them to execute the transaction were forgeries. There was no sale of computers from Defendant Intech to Microstar, and there was no merchandise in the Venezuela Customs Office warehouse.

107.    Nonetheless, Canarias received bolivars from the Funding Companies and paid to Defendant Intech the sum of $27,105,310, as directed by the documentation submitted to Canarias by Microstar and CADIVI. .

108.    Defendants Intech and Martinez had direct knowledge that this transaction was fraudulent, as they received $27,105,310, ostensibly as payment for computer equipment which, in fact, Defendant Intech had not supplied. Defendants Intech and Martinez profited from these

individual transactions, and from the Transaction, by receiving a share of the profit generated by the difference between the pegged and the market rate for Bolivars.

109.    As alleged above, Defendant Intech withheld the sum of $709,250 from the funds it received from Canarias.  Additionally, Defendant Intech was paid the sum of $400,000 by CII on instructions from Gustavo Arraiz, the President of Microstar.  Thus, Defendants Intech and/or Martinez received the total sum of $1,109,250 in compensation for laundering the balance of the funds that had been transferred into Defendant Intech's bank account.

110.    Microstar had direct knowledge that the Transaction was fraudulent, as it authorized the payment of more than $27,000,000 for computers that did not exist.  Further, Microstar falsified numerous documents, including invoices, bills of lading, Customs Office documents and tax documents, among others.

111.    Microstar profited from the Transaction by receiving a share of the profit generated by the difference between the pegged and the market rate for Bolivars.  Following instructions from Microstar, as authorized, CII performed 11 separate swaps of dollar-denominated Venezuelan government bonds for bolivar-denominated Venezuela government bonds – in legally authorized transactions known as *permuta* – at a parallel market rate.  The total value of these *permuta* transactions in favor of Microstar was $19,173,422.39 (dollars) and BS 42,500,808.82 (bolivars).

112.    Pursuant to instructions contained in the lending documents, the Funding Companies were repaid with bolivars obtained through the *permuta* transactions.

113.    The President of Microstar profited from the transaction by receiving direct payments from CII – on instructions from Microstar, as authorized  of $5,511,087.39 into Wachovia Bank,

N.A. of Florida account No. ████0021. In exchange for authorizing the Transaction, Defendants Hernandez, Bastidas, De Robles, Acosta and Angulo personally benefited from the Transaction by receiving bribes, and/or by allowing their friends and/or political allies to do so.

114.    Individual John Doe Defendants 1–10 participated in the Transaction by sharing in the bolivars repatriated to Venezuela, and thereby received a share of the profit generated by the difference between the pegged and the market rate for bolivars and from the money laundering activity described above and at issue in this case

115.    Individual John Doe Defendants 11-20 participated in the Transaction by sharing in the dollars transferred from Defendant Intech, and thereby received a share of the profit generated by the money laundering activities described above and at issue in this case..

116.    Individual John Doe Defendants 21-30 personally benefited from the Transaction by receiving bribes, and/or by allowing their friends and/or political allies to do so.

117.    Corporate John Doe Defendants 1-10 are business entities that participated in the Transaction either by sharing in the bolivars repatriated to Venezuela or the dollars transferred from Defendant Intech, and thereby received a share of the profit generated by the money laundering activities described above and at issue in this case.

118.    Documentation generated by Venezuelan government officials (and attached to this Complaint as Exhibits 1 through 4)[5] demonstrating that the Transaction was not approved in accordance with normal CADIVI procedures and that the documentation relating to the Transaction was not maintained in accordance with normal CADIVI procedures.  For example,

---

[5] Exhibits 1, 2, 3 and 4 are attached hereto in the Spanish original; English translations are attached as Exhibits 1a, 2a, 3a and 4a.  Exhibit 5 is a declaration in English, with some exhibits attached thereto in Spanish.

Defendant Hernandez, President of CADIVI at the time, notes in a letter addressed to investigating prosecutor José Benigno Rojas Lovera that minutes of the CADIVI meeting at which the Transaction was discussed "were not duly recorded in the minutes of the meeting of the Commission; however, their approval is on record in the RUSAD 004 forms of the aforementioned Applications, duly signed by the members of the Commission." (See Exhibit 1 hereto.)

119.    However, in a separate sworn statement to the prosecution, Defendant Bastidas, denies having signed any authorization of the Transaction, while pointing out that the minutes of the board of directors meetings for the related period are missing. (See Exhibit 2 hereto.) This is confirmed by the fact that CADIVI produced board minutes to the investigating prosecutor in response to the prosecutor's request; however, those minutes purporting to approve the Transaction were missing from the production.

120.    Relatedly, a Venezuelan National Guard officer who personally went to CADIVI's offices in an effort to gather information relating to the transactions at issue has reported that "they put us in a conference room and did not allow us to access the other areas of said institution." He asserted that such a procedure "was very peculiar." (See Exhibit 3 hereto.)

121.    The same National Guard officer was subsequently asked "whether during the visit made to the CADIVI facilities, the archives or vault(s) of said were institution searched. If yes, tell me if any sort of inventory was kept. If no, then why not?" (See Exhibit 3 hereto.)

122.    He answered: "At no time did we have access to the facilities where the CADIVI archives are kept. We were limited to the conference room and the Legal Clinic, accompanied by

Major Valdes, we were informed that no action could be taken if it was not authorized by the CADIVI Commission." (See Exhibit 3 hereto.)

123. Further, Mr. Osiris Simon Bolivar, Assistant to the Office of Coordination of the National Customs and Tax Enforcement, Zuliana Region, was in June of 2004 a member of the fiscal team of the Security Director's Office of the National Guard. He was then acting at the direction of the Director of the Customs Division and thus a government investigator who participated in a raid conducted by the Customs Division. In an official interview conducted by Venezuelan Prosecutor's Office, Mr. Bolivar has stated his view that "there must have been persons within CADIVI who allowed the company to harm the State" by allowing the Microstar transaction to go forward. (See Exhibit 3 hereto.)

D.    The Microstar Transaction Is Used To Persecute Plaintiff

124. As described fully below, Plaintiff was eventually indicted, investigated and prosecuted in connection with the Transaction. Prosecutors assigned to investigate and prosecute Plaintiff have since confirmed that the investigation and prosecution were gravely directed and compromised by political influence. The persons participating in these investigations and prosecution were repeatedly the subject of political pressure, and documents relating to the transaction were falsified and spoliated.

125. For example, José Benigno Rojas, at one time the prosecutor responsible for investigating Transaction, gave a public interview in Venezuela which appeared in the August, 2009, *Exceso* Magazine. Rojas states there that he, like other prosecutors assigned to the criminal proceedings against Plaintiff, believed that CADIVI personnel were ultimately responsible for the fraudulent Transaction. Rojas states "I proposed to indict the CADIVI folks because, if in fact Microstar

committed the act, there is no question that it would not have been able to do it without help from Banco Canarias and CADIVI, which was the entity that did not perform follow-through, control and verification regarding the merchandise. I was told, because of institutional issues, that I could not indict the CADIVI people." This instruction came from Defendant Rodriguez, who was at that time the Attorney General of Venezuela.

126.    The article goes on to describe how Defendant Rodriguez refused to permit Rojas to investigate the case as he saw fit. Instead, Defendant Rodriguez insisted that Rojas seek Plaintiff's pretrial detention while conceding that there was no legal basis to do so.

127.    Rojas responded to this demand by saying: "I could not be a party to that. I could never request detention for a crime that has not been indicted because that is completely illegal. He became angry, took me off the case and returned me to my duties. Subsequently, I resigned from the institution. Look, Cedeño is paying for being a friend of Carlos Ortega and Patricia Poleo. It's political."

128.    Rojas concludes: "The Microstar case has resulted in 17 prosecutors leaving the Ministerio Público [equivalent of Justice Dept.], not just me. Those of us who refused are gone."

129.    Similarly, Yoneiba Parra, a prosecutor assigned to the prosecution of Plaintiff subsequent to Rojas' resignation, corroborates these facts. In September 2009, Ms. Parra was served with a subpoena issued pursuant to 28 U.S.C. § 1782 by the United States District Court for the Southern District of Florida, at the behest of Plaintiff's criminal defense attorneys in Venezuela. In sworn deposition testimony in Miami, Ms. Parra describes numerous interventions in her exercise of prosecutorial discretion, and instances in which her judgment as a prosecutor was overruled, to ensure that Plaintiff would be charged and imprisoned regardless of the evidence –

and indeed in spite of the lack of evidence that he was guilty of the crimes of which he was to be charged. A true and correct copy of the transcript of her testimony is attached hereto as Exhibit 4.

130.    Ms. Parra explains in her testimony that she was told, directly by Defendant Rodriguez – the Attorney General of Venezuela – that these manipulations of the prosecutorial process occurred because President Chávez had a personal interest in the case. (Exhibit 4a, at 33:10-17.) Thus, judicial review, prosecutorial discretion and the application of the rule of law to Plaintiff were suspended in favor of simple implementation of a political decision.

131.    Ms. Parra testified that "We [in the office of the prosecutor] argued regarding the steps to be followed within the investigation. However, it was useless. There was an existing order and it should be complied with independently from whatever the prosecutor's opinion was." (Exhibit 4a, at 53:10-14.)

132.    Ms. Parra further testified that , "everything was channeled in just trying to search and obtain anything that would make guilty Mr. Eligio Cedeño[.]" ( Exhibit 4a at 43:18-21.)

133.    Ms. Parra also testified that she was prevented from searching for evidence, which she believes exists, that high officials within CADIVI were direct participants in the money laundering transactions for which plaintiff was being prosecuted. Ms. Parra testified, however, that her "superiors were trying to prevent [her] from focusing attention on other people like people at CADIVI." Exhibit 4a at 68:25.

134.    As Ms. Parra testified:

> [S]eeing the amount of money or foreign currency that was requested to CADIVI, I
> noticed that said amount should be authorized by the commission -- the presidential

commission, I believe was the name or is its name, which was made up of, amongst other people, by citizen Edgar Hernandez Behrens.

When I began to notice these details, I pointed out that they [i.e., CADIVI] should have met and this meeting should be reflected in minutes in which they authorized the handing over of foreign currency or the delivery of foreign currency requested.  I recall that a superior had pointed out --

Q     In this, the transaction we're talking about is specifically in connection with the Microstar transaction?

A     Yes, yes, of course.  A superior indicated to me to not investigate Adina Bastidas because she had been Vice President of the Republic [Venezuela] and Edgar Behrens was the president of BANDES.

Q    What is BANDES?

A     It's an institution, it's a banking institution belonging to the government which provides credits or loans to people.

Q    Okay.

A    Yes, I recall basically that I was told not to investigate those people.

Q    And this was by a superior?

A    Yes.

(Exhibit 4a, at 76:7-78:4.)

135.    Other Venezuelan public officials have acknowledged that President Chávez personally controlled both the prosecution of Plaintiff and judicial decisions regarding the prosecution, to ensure that his will – that plaintiff be incarcerated – would be carried out.  For example, when asked about Plaintiff's case, Dr. Maria Elena Garcia Pru, Former Vice President of the Criminal Judicial Circuit of Caracas, remembered the case very well.  She stated that she believed that the majority of the orders in that case came directly from President Chávez through his Attorney General, Defendant Rodriguez.

35

136.   Dr. García Pru has opined that Plaintiff's incarceration without bail was unjust and based solely on the orders of Defendant Rodriguez, Luisa Estella Morales, President of the Judicial Circuit of Caracas, and the president of the Supreme Court, Aponte Aponte, all of whom were following orders from President Chávez.

137.   Indeed, as the former Vice President of the Criminal Judicial Circuit of Caracas, and a judge with a direct role in judicial review of Plaintiff's case, Dr. García Pru has made clear her conviction that the judges or the prosecutors in the Cedeño case were following the direct orders of Defendant Rodriguez, who they believed was being directed by President Chávez.

138.   Dr. García Pru believes that Plaintiff was attempting to mount a criminal case against CADIVI, and that when the President of the Judicial Circuit of Caracas, Luisa Estela Morales, became aware of this, she pulled the case from the presiding judge and sent it to Superior Court of Caracas to ensure that there would be no judicial review of CADIVI's activities.

139.   Separately, Judge Yuri López  a former Venezuelan judge, has provided a sworn declaration further confirming that Plaintiff's incarceration is purely political.  In 2007, Plaintiff filed a criminal complaint against certain officials in the Attorney General's Office, alleging prosecutorial misconduct in his criminal proceedings.  The complaint was accidentally assigned at random to Judge López, who was not swayed by the influences of the Bolivarian Revolution. When Dr. García Pru – Judge López's superior – learned that the matter had been assigned to Judge López, she threatened to "destroy" Judge López if Plaintiff's criminal complaint was admitted.

140.   Judge López ignored the threats and admitted Plaintiff's complaint because she considered that it properly alleged a criminal violation.  She was immediately placed on

36

involuntary vacation status and, after an attempted kidnapping of one of her children failed, she fled Venezuela and was granted political asylum in the United States. A true and correct copy of Judge López's sworn declaration is attached hereto as Exhibit 5 hereto.

141.    The United Nations Task Force on Arbitrary Detention ("U.N. Arbitrary Detention Task Force") was established by Resolution 1991/42 of the Commission on Human Rights, which clarified and extended its mission through Resolution 1997/50. The Human Rights Council assumed responsibility for the Task Force through decision 2006/102 and extended it for a new period of three years by resolution 6/4 of September 28, 2007.

142.    On September 1, 2009, the U.N. Arbitrary Detention Task Force issued an Opinion finding that Plaintiff is arbitrarily detained. Specifically, the U.N. Arbitrary Detention Task Force stated as follows:

> 53.    In light of the above, the Task Force issues the following Opinion:
>
> The deprivation of freedom of Mr. Eligio Cedeño is arbitrary, since it violates the provisions of articles 9, 10 and 11 of the Universal Declaration of Human Rights, and 9, 10 and 14 of the International Covenant on Civil and Political Rights, and falls within category III of the categories applicable to the examination of the cases presented to the Task Force.
>
> 54.    Consistent with the Opinion issued, the Task Force is asking the Government of Venezuela to remedy the situation of Mr. Eligio Cedeño according to the provisions of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, by granting him provisional freedom until the end of the trial, and also adopting measures for the trial against him not to suffer new undue postponements.

> E.    Defendants Use The Criminal Charge They Have Concocted To Extort From Plaintiff His Ownership Interest In Two Venezuelan Banks, Threatening That If He Does Not Sell Them To Defendants For A Fraction Of Their True Value He Will "Rot in Jail"

143.    In or around January 2007, Defendant Zambrano and two attorneys presented themselves in Plaintiff's office and stated that they were appearing as emissaries of Defendant Carreño, who was at all relevant times the Minister of Justice and Interior, the superior of Defendant Rodriguez, the Attorney General, and therefore effectively able to control the prosecution of Plaintiff.

144.    The purpose of the meeting was to frame the architecture for a potential purchase by Defendant Carreño of Plaintiff's interest in two banks: Banco Bolivar and Banpro.

145.    On information and belief, Defendant Carreño remained directly involved in negotiating for the acquisition of Plaintiffs' banking interests. However, Plaintiff refused to sell his interests in these banks to Carreño.

146.    On information and belief, Defendant Carreño expedited Plaintiff's incarceration when Plaintiff refused to sell to him.

147.    In February 2007, the Attorney General's Office of Venezuela requested Plaintiff's incarceration pending trial. On February 8, 2007, the Court issued a warrant for Plaintiff's arrest at the behest of Venezuela's national secret police (*Dirección de Servicios de Inteligencia y Prevención*) ("DISIP"), which is under the direct control of Defendant Carreño. Hearing rumors of the warrant, Plaintiff voluntarily presented himself to DISIP headquarters, where he was taken into custody. The following day, he was taken before the Control Court, which ordered his pretrial detention, despite the absence of the legal criteria necessary to support it.

148.    Within days of Plaintiff's incarceration, on February 15, 2007, Defendants Vazquez, Idler, and Lara approached Plaintiff and informed him that Defendant Fernandez wished to buy

Plaintiff's interest in Banco Bolivar and BanPro. At or around this time, Defendant Vazquez also informed Plaintiff's brother, Santos Luis Cedeño, that if Plaintiff sold these interests to Defendant Fernandez and at the specified amounts – which were far below the market value of these interests – his criminal legal issues surrounding the Transaction would be resolved.

149.    Defendants Braschi and Lara each owned a small percentage of these two banks, and thus stood to receive a share of the proceeds of any sale. They determined that such a sale, even at the discounted price Plaintiff was being forced to accept, was in their interests. In addition, Braschi and Lara are, and were throughout the relevant time period, close personal friends who trust each other.

150.    Braschi was also employed by Banpro and Banco Bolivar in a position which gave him responsibility for institutional – i.e., government agency  -- accounts.

151.    These negotiations were conducted primarily by Defendants Vazquez and  Idler, on behalf of Defendant Fernandez. Defendant Fernandez himself appeared only briefly to state to Plaintiff that Defendants Vazquez and Idler were his agents and that Plaintiff could speak to them as if he was speaking directly to Defendant Fernandez. Defendants Vazquez and Idler specifically referenced the fact that Plaintiff was incarcerated and charged with crimes arising out of the Transaction, which justified a vastly reduced purchase price because the sale of the banks would also yield Plaintiff's freedom. When Santos Luis Cedeño bridled at the grossly unfair price these defendants were proposing to pay for the banks and stated his refusal to sell at that price, Defendant Idler responded by stating that Plaintiff "would rot in jail" if Plaintiff did not sell his interest in Banpro and Banco Bolivar to Fernandez at the discounted price Fernandez was offering.

39

152.    Defendant Fernandez was and is very well-connected to the government of the Bolivarian Revolution and his claim to have sufficient influence to mitigate the force or severity of Plaintiff's prosecution was entirely credible. This was particularly so because the interests they sought to buy were the same interests that Defendants Zambrano and Carreño had proposed Plaintiff sell to Defendant Carreño.

153.    Defendant Lara also participated in the negotiations from the outset.  However, in the early stages, he pretended to be acting as counsel for Plaintiff.  Only later did he reveal that he was a part of the team offering Plaintiff his freedom in exchange for Plaintiff's willingness to sell his banks at a vastly discounted price.

154.    For a number of years prior to 2007, Banco Bolivar had participated in the local placement of dollar-denominated bonds issued by the state oil company Petroleos de Venezuela (PDVSA).  While these negotiations were being conducted, however, PDVSA dropped Banco Bolivar from the list of financial institutions participating in this financial offering.

155.    At approximately the same time, PDVSA sent letters to Banco Bolivar requesting the early withdrawal/termination of a significant certificate of deposit.  This demand was engineered by Defendant Braschi, though at the time he concealed from Plaintiff the fact that he had taken this step.

156.    Plaintiff avers on information and belief that the purposes of both the removal of Banco Bolivar as an authorized participant in PDVSA's bond offering, and of the removal of its deposit, was to lower the value of Plaintiff's interest in that bank, and thus to depress the price which Plaintiff might be willing to accept in exchange for that interest, as well as to demonstrate the

40

political power of the persons who had issued their extortionate demand to purchase Plaintiff's interests in his two banks.

157.   Shortly thereafter, on February 15, 2007, as described generally above, a series of three short meetings were held between Defendants Vazquez, Idler and Fernandez, on the one hand, and Santos Luis Cedeño, Marcel Rotker (the Chief financial Officer of CII, majority owner of the 2 banks) and Defendant Lara (at that point still pretending to act as counsel for Plaintiff) on the other, the latter group representing Plaintiff's interests.

158.   At these meetings, Vazquez and Idler offered and demanded to purchase Plaintiff's ownership interests in Banpro and Banco Bolivar on behalf of Defendant Fernandez.  Vazquez and Idler explicitly and repeatedly referenced the legal threat facing Plaintiff by virtue of the charges against him arising out of the Transaction, but they claimed that Fernandez had direct access to President Chávez personally and claimed that he could cause Plaintiff to be released from prison if Plaintiff agreed to sell these bank interests at a sufficiently attractive price.

159.   In particular, at the second meeting, which occurred around mid-day, Vazquez and Idler claim they wish to pay a fair market price and that the purchase price had nothing to do with Plaintiff's legal situation. However, at the subsequent, afternoon meeting, Vazquez and Idler offered to purchase Plaintiff's interests in these two banks for roughly $150 million. Both Santos Luis and Rotker responded that this amount was far beneath the bank's true value. Vazquez answered that "considering the fragility of the situation this is the right price now."

160.   Santos Luis stated that the price was too low and that neither Plaintiff nor Santos Luis would agree to it.  Defendant Idler responded "if so, then your brother will rot in jail."  Shortly thereafter, the meeting ended.

161.    Rotker and Santos Luis then went to call Plaintiff (already incarcerated for over a week) to explain the situation to him.  Under this great pressure, Plaintiff eventually agreed to accept the sum of $175 million, still far below fair market value.

162.    Santos Luís Cedeño was at this time shareholder and a Director of CII, through which Plaintiff held his interests in Banpro and Banco Bolivar.  In that capacity,  Santos Luis had legal authority to bind CII and thus sign the  appropriate documents/agreements to sell these bank interests.

163.    A Letter of Intent ("LOI") was signed by Santos Luis Cedeño on behalf of CII and by Defendant Vazquez on behalf of Defendant Alhambra Investments, LLC the following day, for the purchase price of $175 million, payable in dollars, by February 28, 2007, and subject to the execution of a Final Agreement.  It was at all times understood that Defendant Fernandez would be the ultimate purchaser of the banks, despite the fact that Defendant Alhambra was the entity designated to acquire the banks from Plaintiff.

164.    Several different agreements embodying Plaintiff's sale of his interests in Banpro and Banco Bolivar  were executed, and  on March 16, 2007, the Definitive/final Agreement providing for sale of these bank interests to Defendant Alhambra.  Defendant Vazquez signed all of the agreements on behalf of Defendant Alhambra.

165.    Vazquez and Idler initially proposed to pay for the banks in dollars, and they purchased between $7 and $9 million in the parallel exchange market to accomplish this.  However, they subsequently insisted on the right to pay in Bolivars, which is how the transaction was ultimately consummated.

166.    On March 11, 2007, after Plaintiff had been incarcerated for over a month, after the purchase price for these two banks had been agreed upon, but before the Definitive/Final Agreement had been signed, Plaintiff's brother Santo Luis Cedeño received a telephone call from Defendant Lara asking that Santos Luis come to Lara's home.   When Santo Luis arrived, Defendant Lara made small talk and then invited Santa Luis into a private room. Once there, Defendant Lara revealed his true colors when he partially removed from a briefcase what appeared to be an official court document bearing the Plaintiff's name and his National Identification number, and a judicial seal.   Lara told Santos Luis that this document was a Release Order directing Plaintiff's release from incarceration, and that the Order would be carried out as soon as the documents embodying the sale of the banks had been signed.

167.    When Santos Luis asked to hold the document in his hands so he could review it, Lara refused, saying "no, not until [Defendant] Ricardo Fernandez has a chance to meet with President Chávez and he authorizes the release order.  Until then, no-one will dare to execute the release order."

168.    Santos Luis reasonably believed that Defendant Fernandez had personal access to President Chávez, both because Fernandez's personal security is provided by police officers using marked government vehicles, and because it is public knowledge that Defendant Fernandez has frequently traveled with President Chávez outside the country on official Venezuelan government business.

169.    The sale agreements were accordingly signed on March 16, 2007.

170.    After the sale, both Defendant Lara and Defendant Braschi received from Plaintiff the proceeds of the sale representing their share ownership of the banks, deposited into the United States bank accounts which each of them maintains and/or controls.

171.    Defendant Lara told Santos Luis that Defendant Fernandez would meet with President Chávez the next day to discuss Plaintiff's release from prison.

172.    Plaintiff accordingly sold his interests in these two financial institutions to Defendant Alhambra for the amounts Vazquez and Idler agreed to pay, even though those amounts were tens of millions of dollars less than the actual market value of the interests being sold.

173.    Nonetheless Plaintiff was not released from prison and his prosecution has continued.

174.    Three days after Defendant Lara's meeting with Plaintiff, Plaintiff asked Santos Luis to meet with Defendants Lara, Vazquez and Idler.  The purpose of the meeting was for them to report to Santos Luis the results of the meeting between Defendant Fernandez and President Chávez.  At this meeting, Defendant Lara told Santos Luis that President Chávez had given instructions that Plaintiff's freedom "needs to be placed on hold a bit longer."

175.    After the March 16 closing, on information and belief, Defendant Alhambra's interests in Banco Bolivar and Banpro were transferred to Defendant Fernandez.  It is a matter of public knowledge in Venezuela that Defendant Fernandez currently owns both institutions and Confederado, a bank formerly owned by Defendants Vasquez and Idler.

176.    On information and belief, Defendant Fernandez holds bank accounts in the United States into which he has deposited his earnings from Banpro, Banco Bolivar, and Confederado; earnings that are the proceeds and gains he secured from this act of extortion.

44

F.     Government Security Personnel Make Clear That Plaintiff Has Been And
Remains Jailed, And Has Been Charged, Solely Because Members of the
Government of Bolivarian Revolution Perceive Him To Be A Threat

177.    Approximately seven months after Plaintiff was incarcerated, his brother Santos Luis

went to visit Iris Valera and another member of the Venezuelan Congress in an effort to garner

support for his brother's release.

178.    Valera is a member of the Human Rights committee of the legislature.  Like virtually all

members of the Venezuelan legislature, Valera is a Chavista – that is, she is a politician loyal to

President Chávez's political party.

179.    After Valera and the other legislator left the meeting, but before Santos Luis himself had

time to leave the room in which the three had been having their conversation, an unnamed man,

unknown to Santos Luis, entered the room carrying a computer.

180.    The man said to Santos Luis "the problem with your brother is the government thinks he

is an enemy."  He added, "how are we going to help this guy when it's obvious he's against the

government?."  Santos Luis answered that his brother was not in politics, and was instead a

banker.

181.    The man turned on the laptop computer and showed Santos Luis a video clip of his

brother participating in one of the many peaceful marches conducted in 2003 by the parties in

opposition to the President Chávez regime.  He then showed Santos Luis another video clip of

his brother protesting outside the headquarters of the Democratic Action party – a leading

opposition political party –while an unwarranted search of the party's headquarters was being

conducted by the regime.

45

182.    When the second of these two video clips ended, the man left, taking his laptop with him.

### G. Plaintiff's Civil Rights Are Repeatedly Violated To Sustain And
### Continue This Baseless Prosecution

183.    In March 2007, the court presiding over his trial ordered Plaintiff's assets in Venezuela to be frozen.

184.    In May 2007, the court ruled that Plaintiff would stand trial on all of the charges in the accusation. However, the Court ruled that all of the evidence offered by Plaintiff in his defense would be disallowed and could not be used at trial.

185.    In May 2007, the court granted Plaintiff's request to visit a urologist for treatment of a deteriorative condition, but took no steps to enforce its own order when Plaintiff's jailers refused to comply.

186.    The prosecution team filed motions to remove the first two judges assigned to preside over the trial of the case. The matter was finally assigned to a third judge and scheduled for trial.

187.    The prosecution failed to appear in court on the day Plaintiff's trial was scheduled to begin. The prosecutors employed the same tactic no fewer than four additional times, including on the day designated for selection of the two civilians – called escabinos – who would hear the evidence and, together with the judge, vote on a verdict. Each time the prosecutors failed to appear, they prevented the trial from commencing.

188.    Trial began on March 31, 2008. Because all of Plaintiff's evidence had been disallowed, he was forced to defend himself by cross-examining the state's witnesses. Even with this

46

disadvantage, the state's witnesses disproved all of the charges against Plaintiff with (among other statements) the following testimony.

189.    An expert witness designated by Sudeban, Venezuela's banking regulator, testified that all of Banco Canarias' actions were legal.

190.    The same expert witness testified that the source of the Venezuelan currency was not Canarias or Plaintiff, but commercial paper provided by six independent companies acting for Microstar; therefore confirming that there was no embezzlement.

191.    The same expert witness testified that no diversion of Canarias funds could be established and that, conversely, the bank had earned a reasonable commission, also confirming that there was no embezzlement.

192.    An expert witness from the CBV testified that the Venezuelan state suffered no loss (damage), a required element of the state's diversion claim.

193.    The state's customs experts stated that no false documents were submitted to the Customs Administration, a required element of the state's smuggling claim.

194.    On June 10, 2008, the day of closing arguments in Plaintiff's trial, the prosecution submitted a motion to recuse the trial judge, arguing that she was having an affair with Plaintiff during his incarceration, citing a tabloid article that quoted no source.

195.    During the interim period needed for the Court of Appeals to throw out the recusal, the Supreme Court of Venezuela admitted an interlocutory appeal Plaintiff had filed some seven months earlier on the issue of his improper incarceration.  This act on June 17, 2008 by the

Supreme Court of admitting the interlocutory appeal – which Plaintiff had filed in order to protect his own rights – had, in fact, had the opposite effect by staystaying the trial proceedings until the interlocutory appeal was decided. Although the Supreme Court should by law decide the interlocutory appeal within 30 days after it is admitted, the Supreme Court failed to do so and the proceedings stalled indefinitely while Plaintiff remained incarcerated.

196.    Venezuela law prohibits pretrial detention for more than two years.  On December 17, 2008, the Attorney General's Office requested an extension of this limitation, but provided no substantive reasons to support its request.  By February 9, 2009 – the two-year anniversary of Plaintiff's incarceration – no decision was made on the state's extension request.  Plaintiff request for immediate release, however, was ignored.

197.    Eventually, on May 7, 2009, the Criminal Chamber of the Supreme Court of Venezuela sent Plaintiff's case back for an indictment, which resulted in the following:  First, on May 28, 2009, the Attorney General's Office took the formal steps necessary to indict Plaintiff on allegations of embezzlement, within the 30 days required by the Supreme Court.  The indictment alleged no new facts.

198.    Second, on June 10, 2009 provisional judge Norbis Díaz, acting in her capacity as the new control judge, granted a prosecution request to extend the maximum allowed period of pretrial detention by adding two more years to the term.  Even though the prosecution's motion for an increased term did not provide any reasons for the request, provisional judge Díaz added an additional two years on the ground that the file was voluminous.  She ignored Plaintiff's arguments concerning the impropriety of the motion.  Thus, Plaintiff would be subject to up to 4½ years of pretrial detention (assuming no additional extensions are granted), which is

equivalent to a full half of the maximum allowable sentence for the alleged crimes. Plaintiff appealed this decision immediately.

199.    Third, on June 22, 2009 provisional judge Díaz denied a motion filed by Plaintiff that would have required the prosecution to comply with Article 250 of the Venezuela Code of Criminal Procedure and file its formal accusation (*acusación*) against Plaintiff within the same 30 days required by the Supreme Court for his new indictment. Instead, she accepted a late *acusación* presented by the Attorney General's Office on June 18, 2009. This decision was also appealed.

200.    Subsequently, on October 8, 2009, Appellate Court No. 8 – a three-member panel – rendered its decision on Plaintiff's appeal of provisional judge Díaz's extension of the pretrial detention period. In a unanimous decision, Appellate Court No. 8 modified provisional judge Díaz's decision and reduced the extension to eight months on the ground that a two-year extension was legally excessive. The appellate court also opined that the eight-month extension should be calculated from February 8, 2009, the date on which the two-year limit for pretrial extension had originally expired. Although the appellate court stopped short of ordering Mr. Cedeño's release, the net effect of the decision was that his pretrial detention was effectively over and he was entitled to immediate release.

201.    The proceedings immediately returned to the control court, and a new control judge, provisional judge Jesús Boscán, was assigned. Provisional judge Boscán, however, refused to implement the appellate court decision and to order Plaintiff's release, despite daily demands from the defense team, including a petition for *Habeas Corpus*. Moreover, provisional judge Boscán allowed the prosecution to present two internally inconsistent requests: first, the

prosecution requested clarification of the date from which the eight-month extension was to be calculated, notwithstanding the fact that the appeals court had expressly stated that Plaintiff's pretrial detention could be extended only until October 8, 2009; and second, even though the appeal was not yet final because it was subject to the prosecution's own request for clarification, the prosecution filed a constitutional appeal (*amparo*), taking the absurd position that the public right to impose a criminal punishment had somehow suffered a constitutional violation. As a consequence of the filing of the *amparo*, the proceedings were automatically transferred to the Constitutional Chamber of the Supreme Court for a determination of whether the *amparo* would be admitted.

202.    On October 20, 2009, the Constitutional Chamber of the Supreme Court admitted the *amparo* and suspended the decision by Appellate Court No. 8. Remarkably, while the Constitutional Chamber of the Supreme Court typically requires months before ruling on the admissibility of an *amparo*, in this case, it ruled in only three days. The President of the Constitutional Chamber (and of the Supreme Court itself), Luisa Estella Morales Lamuño, assigned the opinion to herself, despite assuring the press only days earlier that the Cedeño case would not be singled out for special treatment. The lone dissent from amongst the seven who comprise the Constitutional Chamber of the Supreme Court came from Magistrate Rondón Haaz.

203.    Meanwhile, Appellate Court No. 8 was reconstituted by the addition of a new member, Magistrate Lenin Fernández. On October 20, 2009, the same day on which the Constitutional Chamber of the Supreme Court admitted the *amparo*, Appellate Court No. 8 issued a new opinion "clarifying" its prior decision, changing the method for calculating the eight-month extension of Plaintiff's pretrial detention, in clear violation of the legal principle of "law of the

case." Magistrate Fernández concurred in this opinion. Appellate Court No. 8's new "clarified" decision instead calculated the extension beginning on the date on which Appellate Court No. 8 had issued its new "clarified" decision. Magistrate Ana Villavicencio reversed herself and concurred with Magistrate Fernández in the decision. The drafter of the original opinion by Appellate Court No. 8 – Magistrate Juan Carlos Espín – dissented from the "clarified" decision, and has since been demoted from the appellate level to a court of original jurisdiction.

204.    On November 2, 2009, Plaintiff's *Habeas Corpus* petition was declared inadmissible. Further, on November 8, 2009, the appellate court rejected Plaintiff's appeal concerning the prosecution's late filing of its *acusación.*

## COUNT I

### BY PLAINTIFF ELIGIO CEDEÑO

### AGAINST DEFENDANTS EDGAR HERNANDEZ BEHRENS, ADINA MERCEDES BASTIDAS, CASTILLO, MARIA ESPINOZA DE ROBLES, ALFREDO PARDO ACOSTA, MAIGUALIDA ANGULO INTECH CORPORATION AND DOMINGO MARTINEZ

### For violation of 18 U.S.C. §1962(c)

205.    Plaintiff repeats and re-alleges ¶¶1 through 204 as if fully set forth herein.

206.    The foreign exchange regime of the government of Venezuela, including CADIVI, the Central Bank of Venezuela, and the government agency which prosecutes alleged violations of Venezuela's foreign exchange laws, constitutes an enterprise ("the ForEx Enterprise").

207.    Defendants Hernandez, Bastidas, de Robles, Acosta and Angulo are persons for purposes of 18 U.S.C. §1962(c) (the "ForEx Defendants").

51

208.    Defendants Intech Corporation and Martinez are persons for purposes of 18 U.S.C. §1962(c).

209.    The ForEx defendants operate the ForEx Enterprise by executing the currency exchange racketeering scheme described herein.

210.    Defndants Intech Corporation and Martinez participated in the Transaction and, on information and belief, have participated in essentially identical transactions in other instances, which did not involve the Plaintiff but which were structured in the same way and also involved deposits into, and withdrawals out of, dollar denominated accounts in the United States.

211.    In violation of 18 U.S.C. §1962(b), defendants the other RICO Persons named herein have acquired and maintained their hold on political power, their positions within the Enterprise, and thus their ability to operate the Enterprise and to profit from the Enterprise's activities, through a pattern of racketeering activity.

212.    This pattern, as more fully described below, includes the commission of money laundering in violation of 18 U.S.C. §1956 through acts of defrauding a foreign bank – to wit, by defrauding Canarias to induce its officials to authorize and pursue applications to acquire U.S. dollars at the then current official rate of Bs 1.6 per $1.

213.    In addition, in violation of 18 U.S.C. §1962(c), Defendants conducted and participated directly in the affairs of the Enterprise through a pattern of racketeering activity, as defined below.

214.    The transmissions of U.S. dollars into the Bank of America bank account of Defendant Intech identified in ¶2, as alleged ¶96; and the subsequent transmissions out of that account as detailed in ¶99 herein, , constitute money laundering as defined by 18 U.S.C. §1956 inasmuch as

      a.   the funds represent the proceeds of a form of unlawful activity, namely breach of the foreign exchange law of Venezuela and the defrauding of a foreign bank as specified by 18 U.S.C. §1956(c)(7)(B)(iii);

      b.   the funds thus obtained were appropriated by defendants as part of a scheme to defraud using interstate wire transmissions, in violation of 18 U.S.C. §1343, and is thus an act constituting an offense listed in 18 U.S.C. §1961(1);

      c.   each of the Defendants named herein knew that each of the transactions in which they personally participated was designed in whole or in part to conceal or disguise the nature, source, ownership or control of the proceeds of specified unlawful activity; and

      d.   These money laundering transactions took place on the dates, and into and out of the indicated accounts and amounts, as set forth above in ¶¶92-113.

The Transaction was just one of a great many similar transactions engaged in by the ForEx Defendants and other persons within the regime of the Bolivarian Revolution or who are friendly with such persons.  All of these transactions involved the acquisition, by government officials or friends of such officials, of the opportunity to obtain dollars at the official, pegged rate based on the submission of fraudulent documentation to, among other institutions, a bank which is a "foreign bank" for purposes of 18 U.S.C. § 1956(c)(7)(B)(iii); the laundering of such dollars in

U.S. bank accounts; and the repatriation of the dollars to Venezuela, where they could be used to acquire bolivars at the market rate – all of which occurs along with payments and bribes to those persons who grant permission for, or otherwise assist with, the execution of such money laundering operations.

215.    Defendants Hernandez, Bastidas, De Robles, Acosta and Angulo all participated directly in the Transaction by authorizing the Transaction knowing that it was fraudulent, and particularly by authorizing fraud on a "foreign bank" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iii), and by taking steps to conceal their activity from subsequent investigation, thereby casting false suspicion upon Plaintiff.

216.    Defendants Intech and Martinez directly profited from the Transaction by retaining certain of the proceeds of the Transaction, as more fully detailed in ¶108-109 above.

217.    Plaintiff has been injured in his business and property by virtue of the fact that his continued imprisonment has deprived him of his liberty and made it impossible for him to conduct his business affairs properly.

218.    The movements of money – the transformation of bolivars into dollars at the favorable government rate; the transfer of these funds into a series of U.S. banks, and the ultimate disgorgement of the proceeds to various supporters of the Bolivarian Revolution  and their friends, are but a tiny fraction of the money laundering transactions that occur every day in Venezuela under the auspices of the Venezuelan government officials who control the Venezuelan foreign exchange regime, as well as their political superiors and allies.

219.    The ForEx Defendants conducted or participated in the operation of the ForEx Enterprise through a pattern of racketeering activity, including by directing the release of dollars through the CBV's New York account in order to facilitate the Transaction; the fraud on a foreign bank, described in ¶85, which was an essential part of the Transaction.

## COUNT II

### BY PLAINTIFF CEDEÑO

### AGAINST DEFENDANT JULIAN ISAIAS RODRIGUEZ DIAZ

#### For Violation of 18 U.S.C. §1962(d)

220.    Plaintiff repeats and re-alleges ¶¶1 through219 as if fully set forth herein.

221.    Because they are important members of the Bolilvarian Revolutionary government, the ForEx Defendants are able to call upon other persons with authority in that government to take actions that benefit the ForEx Defendants and that enable them to operate the  ForEx Enterprise for their own benefit and for the benefit of their political allies.  An important tool in the hands of the ForEx Enterprise is the ability to utilize these relationships – including their relationship with Defendant Julian Isaias Rodriguez Diaz, and to credibly threaten persons such as the plaintiff who support political candidates who would remove the ForEx Defendants from positions of public authority.

222.    Plaintiff is in prison because he has supported political candidates who oppose the political regime that has placed the ForEx Defendants, and/or their friends and allies, in positions of public authority.  By imprisoning Plaintiff, the ForEx Defendants and Defendant Julian Isaias Rodriguez Diaz achieve the following important goals:

    a.  They prevent Plaintiff from providing further support to political candidates who would remove the ForEx Defendants, and their friends and allies, from power – thereby preserving and maintaining their hold on power and thus their ability to continue to operate, and profit from, the ForEx Enterprise;

    b.  They credibly threaten any other person who might otherwise choose to act as Plaintiff has and lend support to political candidates who would remove the RICO Persons, and their friends and allies, from power.

223.    Defendant Julian Isaias Rodriguez Diaz conspired with the ForEx Defendants to direct that Plaintiff be imprisoned, notwithstanding the refusal of numerous Venezuelan government Prosecutors and Judges, because Plaintiff was deemed a threat to the stability of the Bolivarian Revoolution regime, and in order to preserve the ability of the ForEx Defendants to continue to operate the ForEx Enterprise.

224.    Plaintiff has been injured in his business and property by virtue of the fact that his continued imprisonment has deprived him of his liberty and made it impossible for him to conduct his business affairs properly.

## COUNT III

### BY PLAINTIFFS CEDEÑO AND CII

**AGAINST DEFENDANTS, JUAN FELIPE LARA FERNANDEZ, WERNER BRASCHI, GONZALO E. VAZQUEZ PEREZ, RUBEN ROGELIO IDLER OSUNA, RICARDO FERNANDEZ BARRUECO, AND ALHAMBRA INVESTMENTS LLC**

**For Violation of the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1962(b)**

225.    Plaintiff repeats and re-alleges ¶¶1 through 224 as if fully set forth herein.

226.     The Defendants named in this Count acquired control of two Enterprises – Banpro and Banco Bolivar – through a pattern of racketeering activity, namely the deposits into the U.S. bank accounts owned or controlled by Defendants Lara and Braschi which were made to capture their proceeds from the sale.

227.     In addition, all Defendants named in this Count made use of the fraud on a foreign bank, in the Transaction itself, which afforded all Defendants the basis for incarcerating Plaintiff, thereby making him vulnerable to the extortion which resulted in these Defendants being able to purchase Plaintiff's interests in Banpro and Banco Bolivar.

228.     That fraud was a direct and necessary element of the Plaintiff's extortion, for without his imprisonment Defendants would have had no basis for offering Plaintiff his freedom in exchange for his disposition of his interests in Banpro and Banco Bolivar at the extortionate price paid by Defendant Ricardo Fernandez Barueca.

229.     Plaintiffs Cedeño and CII have been injured in their business and property by reason of the Defendants' actions described in this Count, inasmuch as the amount paid in this extortionate transaction for their interests in Banpro and Banco Bolivar was far less than the market value of those interests.

230.     Defendant Ricardo Fernandez Barueca has deposited into U.S. accounts the proceeds of his acquisition of his interest in Banpro and Banco Bolivar, in order to conceal – and thereby maintain – his ownership interest in those Enterprises.

# COUNT IV

## BY PLAINTIFFS CEDEÑO AND CII

**AGAINST DEFENDANTS JULIAN ISAIAS RODRIGUEZ DIAZ, PEDRO CARREÑO, JOSE JESUS ZAMBRANO LUCERO, JUAN FELIPE LARA FERNANDEZ, WERNER BRASCHI, GONZALO E. VAZQUEZ PEREZ, RUBEN ROGELIO IDLER OSUNA, RICARDO FERNANDEZ BARRUECO, AND ALHAMBRA INVESTMENTS LLC**

### For Violation of 18 U.S.C. § 1962(d)

231.    Plaintiff repeats and realleges ¶¶1 through 230 as if fully set forth herein.

232.    The Defendants named in this Count conspired with one another to enable Defendant Ricardo Fernandez Barueca to acquire and maintain control over the Enterprises Banpro and Banco Bolivar through a pattern of racketeering activity, including by depositing his earnings from ownership of these Enterprises into U.S. bank accounts which he owns or controls, in order to conceal and thereby maintain his interests in those Enterprises.

233.    The Defendants named herein advanced this Conspiracy by

   a.  In the case of Defendant Julian Isaias Rodriguez Diaz, directing that Plaintiff be imprisoned, notwithstanding the refusal of numerous Venezuelan government Prosecutors and Judges – thereby creating the predicate for the extortion of Plaintiff's interests in Banpro and Banco Bolivar;

   b.  In the case of Defendant Carreno and Defendant Zambrano, demanding that Plaintiff sell his interests in Banpro and Banco Bolivar, and then, on information and belief, directing that Plaintiff be imprisoned when Plaintiff refused to sell;

58

c. In the case of the remaining Defendants named in this Count, utilizing Plaintiff's imprisonment, and the opportunity it provided to offer him his freedom in exchange for his interests in Banpro and Banco Bolivar.

234.    These actions culminated in the deposits of the proceeds of this extortion scheme in to the U.S. accounts controlled by Defendants Lara and Braschi, and in the deposit into U.S. accounts controlled by Defendant Fernandez of his earnings from the two banks which he had acquired as a result of the actions of the conspiracy defined in this Count.

235.    Plaintiffs Cedeño and CII have been injured in their business and property by reason of the Defendants' actions described in this Count, inasmuch as the amount paid in this extortionate transaction for their interests in Banpro and Banco Bolivar was far less than the market value of those interests.

## DEMAND FOR JURY TRIAL

236.    Plaintiff Eligio Cedeño demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eligio Cedeño respectfully requests the Court to:

(a) enter judgment in favor of Plaintiff on all counts of the Complaint;

(b) enter judgment in favor of Plaintiff, and against each Defendant, in an amount to be determined at trial, and trebled;

(c) freeze, and establish a constructive trust over, all assets in United States bank accounts representing the proceeds of the illegal activity at issue in this case, for the benefit of Plaintiff;

(d) award Plaintiff the costs of suit including reasonable attorneys' fees; and

(e) award Plaintiff such other and further relief as the Court deems just under the circumstances.

Dated: November 23, 2009

_____ /s/ _____

| MARCUS & AUERBACH LLC | DEWEY PEGNO & KRAMARSKY LLP |
|---|---|
| Jerome M. Marcus | Thomas E.L. Dewey |
| Jonathan Auerbach | 220 E. 42nd Street |
| 400 Greenwood Avenue, Suite 200 | New York, NY 10017 |
| Wyncote, PA 19095 | (212) 943-9000 |
| (215) 885-2250 | |

ATTORNEYS FOR PLAINTIFF